**TRANS–TEC ASIA, Plaintiff,**

v.

**M/V HARMONY CONTAINER Its freights, engines, apparel, and tackle, Defendant in rem**

**Splendid Shipping Sendirian Berhard, Defendant, and**

**The Master of the M/V Harmony Container, Garnishee.**

**No. CV 04–1160 SVW(MANX).**

United States District Court, C.D. California.

Feb. 2, 2006.

Maria Del Rocio Ashby, McKasson Klein and Holmes, Costa Mesa, CA, for M/V Harmony Container, Splendid Shipping Sendirian Berhad, Defendants.

Gary R Clouse, Isaacs Clouse & Crose, Santa Monica, CA, for Trans–Tec Asia, Plaintiff.

Neil B Klein, McKasson Klein and Holmes, Costa Mesa, CA, for M/V Harmony Container, Splendid Shipping Sendirian Berhad, Defendants.

Bradley M Rose, Kaye Rose & Partners, Los Angeles, CA, for M/V Harmony Container, Splendid Shipping Sendirian Berhad, Defendants.

J Stephen Simms, Simms Showers, Baltimore, MD, for Trans–Tec Asia, Plaintiff.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WILSON, District Judge.

### I. INTRODUCTION

This admiralty case arises out of a dispute over unpaid bunkers (fuel). Plaintiff Trans–Tec Asia ("Trans–Tec") sold bunkers to the charterer of the M/V Harmony Container ("Vessel"), the Kien Hung Shipping Company Ltd. ("Kien Hung"). Kien Hung later went bankrupt. Its bunkers still unpaid, Trans–Tec filed this action against the Vessel and its Owner, Defendant Splendid Shipping Sendirian Berhard ("Splendid").

In its Order of August 15, 2005 ("August 15 Order"), the Court determined that Ma-

laysian law applied to the dispute. In its Order of October 20, 2005 ("October 20 Order"), the Court granted summary judgment to Splendid on the issue of unjust enrichment. In its October 20 Order, the Court also informed the parties that it would reconsider its prior decision that Unites States law governed the incorporation of a choice of law clause into a contract between Trans–Tec and Kien Hung. Specifically, the Court ordered the parties to further brief the following topics:

1. What law should apply to determining the terms of the Bunker Contract, specifically whether the choice of law clause was a term of the Bunker Contract?

2. If Malaysian law would apply, would the choice of law clause be a term of the contract?

3. If the choice of law clause were considered part of the contract, would a maritime lien against the Vessel be available?

The Court finds that Malaysian law determines the terms of the Bunker Contract, including whether the choice of law clause was a term, that Malaysian law renders the choice of law clause a term of the contract, and that applying United States law (the law chosen by the choice of law clause) does not create a maritime lien on the Vessel in favor of Trans–Tec. Thus, the Court GRANTS summary judgment to Defendants.

## II. FACTS

In July 2000, Splendid entered into a New York Produce Exchange charter party contract with Kien Hung for a ten-year charter of the Vessel (the "Charter Agreement").

On February 17, 2003, Trans–Tec agreed to supply Kien Hung with bunkers for the Vessel (the "Bunker Contract"). The Bunker Contract was formed as follows: C.L. Wu ("Wu"), a manager for Kien Hung in its Taiwan office, faxed a bunker inquiry ("Bunker Inquiry") to Vivian Huang ("Huang") of Yee Foo Marine Industrial Co. Ltd. ("Yee Foo"), Trans–Tec's representative in Taiwan throughout 2002 and 2003.[1] Huang was at that time the account representative to Kien Hung. The Bunker Inquiry requested a quote for bunkers to be provided to the Vessel for bunkering at Busan, South Korea on February 24, 2003. Huang faxed the Bunker Inquiry to Margaret Quek ("Quek") of Trans–Tec's Singapore office. Quek provided Huang with a bunker quote. Huang communicated the quote to Wu. In response, Wu faxed Huang a bunker order ("Bunker Order"). The Bunker Order stated: "Many thanks for your quotation on Feb/17/2003. Please arrange the follows [sic] and confirm by return." (Huang Decl. ¶7, Ex. C.) Huang then faxed the Bunker Order to Quek. Quek sent an email to Huang confirming the sale of 1150 metric tons of Grade 380CST RMG35 bunker fuel for the Vessel ("Bunker Confirmation"). Huang then faxed the Bunker Confirmation to Wu.

The Bunker Confirmation provided:

This confirmation incorporates seller's standard terms and conditions dated January 3, 2000. Pls inform us if you require a copy.

All sales are on the credit of the vessel. Buyer is presumed to have authority to bind the vessel with a maritime lien. Disclaimer stamps placed by the vessel on the bunker receipt will have no effect and do not waive the seller's lien.

---

1. Defendants characterize Yee Foo as Kien Hung's representative. However, Huang states in her declaration that Yee Foo is Trans–Tec's representative in Taiwan. (Huang Decl. ¶ 3.)

Pls advise this office immediately of any errors, omissions or changes involving any of the items above.

(Ashby Decl. ¶ 4, Ex. B.) All of these exchanges took place on February 17th.

Trans–Tec's standard terms and conditions are allegedly set forth in a document entitled "The Trans–Tec Services Group of Companies General Terms and Conditions" ("Terms and Conditions"). The Terms and Conditions state:

> Effective January 3, 2000, the following terms of sale and supply shall constitute the General Terms and Conditions ("General Terms") of the Trans–Tec Service Group of companies, headquartered at 700 S. Royal Poinciana Blvd., Miami Springs, Florida 33166 including but not limited to Trans–Tec Services, Inc.; Trans–Tec Services (UK) Ltd.; Trans–Tec International S.A.; Casa Petro S.A. and Trans–Tec Asia, a division of World Fuel Services (Singapore) Pte. Ltd. Unless otherwise agreed, the General Terms shall apply to every sale of marine petroleum products ("Products") entered into between a particular Trans–Tec Group company as seller ("Seller"), and any buyer of such Products ("Buyer").

(Ashby Decl. ¶ 6, Ex. C.) The Terms and Conditions contain, among other things, a Choice of Law Clause. The Choice of Law Clause provides:

> 17. Law and Jurisdiction: Seller shall be entitled to assert its lien or attachment in any country where it finds the vessel. Each Transaction shall be governed by the laws of the United States and the State of Florida, without reference to any conflict of laws rules. The laws of the United States shall apply

with respect to the existence of a maritime lien, regardless of the country in which the Seller takes legal action.

(Ashby Decl. ¶ 6, Ex. C, ¶ 17.)

The bunkers were provided on February 24, 2003, in Busan, Korea. Kien Hung subsequently went bankrupt and Trans–Tec was never paid.

## III. DISCUSSION

### A. Which Law Should Govern the Interpretation of the Bunker Contract?

When Trans–Tec and Kien Hung entered into the Bunker Contract, the confirmation from Trans–Tec to Kien Hung stated:

> This confirmation incorporates seller's standard terms and conditions dated January 3, 2000. Pls inform us if you require a copy.

(Ashby Decl. ¶ 4, Ex. B.) One of those standard terms and conditions was a choice of law clause. In this Court's August 15 Order, the Court determined that the choice of law clause was not incorporated into the agreement between Trans–Tec and Kien Hung. The Court analyzed the issue under United States law. Because the Court went on to determine that Malaysian law governed the dispute between Trans–Tec and Splendid, Trans–Tec now argues that the Court should have determined whether the choice of law clause was part of the contract based on Malaysian law. What is potentially at stake here is the availability of a maritime lien against the Vessel, a remedy not generally available under the law of jurisdictions other than the United States (United States law was chosen in the choice of law clause).[2] *See* 1 Admiralty & Mar. Law

---

**2.** While the Court's August 15 Order specifically found that Splendid was not a party to the contract between Trans–Tec and Kien Hung and thus could not be liable under the

provisions of that contract, this claim is an *in rem* action against the Vessel. Therefore, the fact that Splendid is not liable under the

§ 9–8 (4th ed.) (Thomas J. Schoenbaum ed.)

In the Court's August 15 Order, it applied United States federal law to the question of whether the Bunker Contract included the choice of law provision (which was among the "standard terms and conditions" referred to in communication from Trans–Tec to Kien Hung, *see supra* ). Contrary to Trans–Tec's assertion in its request for the Court to reconsider its ruling, the Court did not apply United States law because that was the law referenced in the choice of law clause. Rather, the Court applied United States law because it interpreted Ninth Circuit precedent to mandate that the validity of a choice of law clause be analyzed using federal common law—in this case, federal maritime law—when construing a choice of law clause, per *The Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 12, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972).

In its August 15 Order, the Court relied on *Richards v. Lloyd's of London*, 135 F.3d 1289 (9th Cir.1998), and *Batchelder v. Kawamoto*, 147 F.3d 915 (9th Cir.1998). *Richards v. Lloyd's of London* involved a situation in which no party disputed that the choice of law clause was part of the written contract; the question was one of whether United States public policy voided the clause. 135 F.3d at 1294. No question of contract law was raised.

In *Batchelder v. Kawamoto*, the plaintiff did plead that he was not provided with the choice of law provision and did not consent to it. 147 F.3d 915. These allegations could be considered to go to basic contract formation issues. The contract in question in *Kawamoto* employed a double choice of law clause: New York law for the contract generally and Japanese law for shareholder suits specifically. In addressing the issue of consent and knowledge,

the court relied on a United States Securities & Exchange Commission release regarding contracts such as the one at issue, and also cited Ninth Circuit cases relying on *Bremen*. *Id.* at 919. While one could stretch this and say that the *Kawamoto* court's analysis is precedent for the proposition that any contract issue involving a choice of law clause is governed by federal law under *Bremen,* the parties in *Kawamoto* do not appear to have raised any issues regarding what law should be used to determine whether the plaintiff had consented to the term. The *Kawamoto* court did not discuss its reasoning for applying United States law and does not appear to have considered whether that was the appropriate body of law.

Finally, *Bremen* itself does not stand for so broad a proposition. *Bremen* was a case in which a United States-based company contracted with a German corporation to tow its drilling rig from Louisiana to Italy. 407 U.S. at 4, 92 S.Ct. 1907. The contract contained a forum-selection clause, selecting the London Court. The U.S. corporation sued in Florida and the district court judge refused to enforce the forum-selection clause. The Supreme Court's ruling in *Bremen* enforced the forum-selection clause and announced a federal common law rule that "a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power ... should be given effect." *Id.* at 12–13, 92 S.Ct. 1907. The analysis engaged in by this Court to determine whether the choice of law clause was part of the contract was far removed from a *Bremen* analysis—instead, it was a UCC-based "battle of the forms" analysis. It seems that Trans–Tec is correct that the Ninth Circuit cases relied on by the Court in its August 15 Order do not definitively speak to the question of what

contract does not presumptively keep the Vessel from being affected by the contract.

law should be used to answer the basic question of whether choice of law was a term of the contract.

The Ninth Circuit does not appear to have spoken on this issue. In a First Circuit case construing the terms of a cruise ticket, the court first engaged in a choice of law analysis, found Swedish law applied to the cause of action, and then remanded the case to the district court for a determination of whether, under Swedish contract law, the pertinent term would be considered part of the contract. *Jansson v. Swedish Am. Line*, 185 F.2d 212, 219–20 (1st Cir.1950). A later case in the First Circuit cited *Jansson* with approval and reasoned by analogy for purposes of deciding whether to give effect to the choice of law clause. *DeNicola v. Cunard Line Ltd.*, 642 F.2d 5, 8 n. 2 (1st Cir.1981). Following the *Jansson* precedent, the *DeNicola* court assessed the contacts with various countries and determined that U.S. law should control whether the clause selecting English law would be given effect. *Id.* Based on this authority, the Court determines that the law that governs the transaction should be used to determine the terms of the contract. Thus, the Court will apply Malaysian law to determine whether the choice of law clause is part of the Bunker Contract.

### B. Applying Malaysian Law. Is the Choice of Law Clause Part of the Bunker Contract?

Defendants argue that under Malaysian law, the choice of law clause would not be incorporated into the Bunker Contract because (1) the incorporation language did not clearly state that one of the terms being incorporated was a choice of law clause; and (2) the choice of law clause was collateral to the contract, not germane to the Bunker Contract's subject matter. According the Defendants' interpretation

of Malaysian law, if a collateral term is not explicitly incorporated by reference then it is not incorporated. Defendants analogize from cases in Malaysia, Singapore and England that take this stance with respect to arbitration clauses. Defendants assert that arbitration clauses and choice of law clauses are functionally similar in that they affect the rights of the parties in a dispute, not the expectations of the parties when performing the contract.

Plaintiff counters by arguing that analogizing between arbitration clauses and choice of law clauses is inappropriate. First, Plaintiff points out that in Malaysia, Singapore, and England, arbitration clauses are typically not actually "clauses" but separate agreements. Second, Plaintiff argues that the effect of an arbitration clause ousting the jurisdiction of the courts is significantly different than applying a different set of substantive laws to a dispute.

Properly ascertaining Malaysian law on the incorporation of terms from one contract into another is made more difficult because, based on the cases cited by both parties, it appears that no Malaysian court has really spoken to this issue, not even under circumstances that allow for analogy. However, both parties freely cite English and Singaporean cases for indications of Malaysian law and one of the only Malaysian cases cited, *Bauer Sdn Bhd v. Daewoo*,[3] also relied heavily on English cases. (Joseph Oct. 17 Decl. Ex. 35.) Thus, this Court can comfortably look to English law and, to some extent, Singaporean law to predict Malaysian law.

While there is occasional conflicting language in the cases, the most consistent reading of the cases submitted by the parties is that the policy of the Malaysian, Singaporean and English courts not to allow parties to incorporate arbitration by

---

**3.** (1994) 4 MLJ 545.

reference does not apply to this dispute. It is unnecessary to decide whether a Malaysian court would consider arbitration clauses and choice of law clauses as sufficiently similar to recommend similar approaches; even if this were an arbitration clause, rather than a choice of law clause, the Court's interpretation of the law is that a Malaysian court would allow the arbitration clause to be incorporated by reference.

The root of the doctrine requiring specific language in order to incorporate arbitration clauses seems to stem from two concerns that are relevant to this case: (1) that when terms are incorporated from one contract to another, it can generally be assumed that the relevant terms for incorporation are the substantive terms germane to the contract's subject matter, not the jurisdictional terms; and (2) that the wording of arbitration clauses typically specifies disputes "arising out of this contract," so that to incorporate one contract's arbitration clause into another contract requires the meaning of the clause to be somewhat manipulated (so that disputes arising out of this *other* contract *also* require arbitration). Essentially, this all boils down to intent. Not "intent" such that the party signing the second contract (which incorporates terms from another contract) actually knows what the terms are, but "intent" in the sense that if both parties sat down and read both the second contract and the contract from which terms were being incorporated, the parties would recognize that the language of incorporation covers the arbitration clause. The clearest evidence in the case law that these are the concerns animating the policy is that a consistent refrain throughout the cases is that an arbitration clause is appropriately incorporated into another contract if the language of incorporation is specific ("this contract incorporates all the rights

and duties of this other contract, including the arbitration clause") *or* if the language of the arbitration clause, in the first contract, is specific ("any disputes arising out of this contract or a bill of lading related to this contract must be submitted to arbitration").

For example, at first blush, *The Annefield*,[4] an English case in which a bill of lading was said to incorporate the terms of the charter-party, is one of Defendants' strongest cases. Lord Denning wrote:

[A] clause which is directly germane to the subject-matter of the bill of lading (that is, to the shipment, carriage and delivery of goods) can and should be incorporated into the bill of lading contract, even though it may involve a degree of manipulation of the words in order to fit exactly the bill of lading. But, if the clause is one which is not thus directly germane, it should not be incorporated in the bill of lading contract unless it is done explicitly in clear words either in the bill of lading *or in the charter-party*.

(Joseph Sept 26 Decl. Ex. 30 at 49 (emphasis added).) A charter-party contract is between the vessel's owner and the charterer, so it is quite possible that the party entering into the bill of lading would not typically have ready access to the charter-party contract. Yet, as Lord Denning stated in the language above and as he reiterated later in the opinion, clear language in the charter-party contract that the arbitration clause should be incorporated into the bill of lading would have been enough to incorporate the arbitration clause, even if the language in the bill of lading was not specific as to arbitration. Lord Denning's holding would make no sense unless the notice and the intent inquiries were not focused on *actual* notice or actual surprise, but just on notice or

4. (1971) 1 Lloyd's Rep 1.

surprise if you assume that both parties read both documents.[5]

Another case that at first seems to support Defendants' argument is *Anonymous Greek Company of General Insurances "The Ethniki" v. AIG Europe (UK) & Others*,[6] an English reinsurance case in which the underlying insurance contract had a clause in the "conditions" section selecting Greece as the jurisdiction for any disputes and the reinsurance contract said: "CONDITIONS: wording as original." The court found that the jurisdiction clause was not incorporated into the reinsurance contract, commenting that "[i]n my view it is to be inferred that the function of the incorporating words was confined to ensuring that the substantive or subject-matter terms of the reinsurance matched the substantive or subject-matter terms of the primary cover, except where expressly provided to the contrary." (Joseph Sept. 26 Decl. Ex. 32 at 117.) When later discussing whether the incorporation of a jurisdiction-selection clause should be interpreted like an arbitration clause for these purposes, the court explained that the central question was: "did the parties to the contract in which the general words of incorporation appear intend that their contract should include the particular term from the other contract referred to?" and goes on to say:

> the [jurisdiction-selecting] clause does nothing to define the risk, and if regard is had to its terms, they are wholly inappropriate to disputes arising between insurers and reinsurers under the reinsurance contract (as distinct from disputes under the original insurance, which could be binding on reinsurers

notwithstanding that they were decided by Greek courts).

(*Id.* at 118.) While the analysis in *Ethniki* is admittedly more favorable to Defendants' position than that in *The Annefield*, the analysis is focused on whether the jurisdiction clause is germane to the reinsurance contract not because of concerns about notice *per se*, but because of concerns that the clause's collateral status would not make it clear that it was incorporated.

A leading English case, *OK Petroleum*, perhaps expresses this concept best. The specific facts of *OK Petroleum* make much of its analysis irrelevant for purposes of the case at hand—in *OK Petroleum*, the contract incorporating the terms of the charter-party contract was entered into *before* the charter-party contract had been entered into, making it impossible that any notice could have been provided—but the court's analysis is useful. In canvassing the case law on the general topic of incorporating the terms of one contract into another, the court summed up the rationale for the doctrine of only incorporating terms germane to the subject matter of the contract, absent specific wording otherwise:

> the Courts impute to the parties to the incorporating contract a mutual intention by their use of *general words* of incorporation to be bound only by the relevant *subject-matter* of the incorporated contract because the parties are taken to treat those matters which are merely collateral or ancillary to the subject—matter as, for that reason, intrinsically personal to the parties to the incor-

---

**5.** In a later English case, *OK Petroleum*, the court discussed *The Annefield* and quoted the lower court judge in *The Annefield:* "In the end, it seems to me that one has to ask oneself what an ordinary businessman, *having both documents before him,* would think with re-

gard to the applicability of the arbitration clause in the charter-party to bill of lading disputes." (Joseph Sept. 26 Decl. Ex. 29 at 39 (emphasis added in *OK Petroleum* ).)

**6.** (2000) I.L. Pr 426.

porated contract and therefore not self-evidently germane to be incorporated into their own contract.

(Joseph Sept. 26 Decl. Ex. 29 at 45 (emphasis in original).)

Unlike all of the cases relied on by Defendants, the instant case involves a stand-alone document of terms and conditions. This document has no reason to exist beyond encompassing the terms and conditions that Trans–Tec wants to attach to all its dealings. It is not possible that, had Kien Hung looked at the sheet with the standard terms and conditions on it, Kien Hung would not have understood that the choice of law clause was intended to be incorporated. When Kien Hung agreed to the incorporation of the standard terms and conditions, it is not possible that Kien Hung did not expect that *all* of the standard terms and conditions would apply to the transaction. This is not a situation in which the standard terms and conditions were embedded in another free-standing contract and thus the wording of some of the terms and conditions might make it unclear whether the term was applicable to this other, separate contract. The Court's reading of the cases submitted by both parties is that even if this were an arbitration clause rather than a choice of law clause, the arbitration clause would be considered incorporated.

The Court recognizes that one case from Singapore submitted by Defendants analyzes the English cases differently than the Court does:

> Although nowadays other forms of dispute resolutions are no longer perceived as a threat to the court's jurisdiction, recourse to the courts remain [sic] the default route for anyone seeking to assert his legal rights. Any agreement to change or deviate from this avenue must be explicit, *and, in my view, arbitration clauses[,] like exemption clauses, must*

> *be expressly brought to the attention of the other contracting party.*

(Joseph Oct. 17 Decl. Ex. 37 at 45 (emphasis added).) In the Court's view, this is an incorrect analysis of the English cases and, since the Singapore court's analysis is based on English cases, and Malaysian courts presumably rely more heavily on the English cases themselves, rather than another country's interpretation of those cases, the Court dismisses the analysis in this case as both wrong and irrelevant.

■ Because both parties would have expected all the Terms and Conditions to apply to the Bunker Contract (including the choice of law clause) had they looked at both the Bunker Contract and the Terms and Conditions, Malaysian law would not exclude the choice of law clause (or an arbitration clause) based on the doctrine of requiring specific reference in order to incorporate ancillary terms from another contract.

Now, the Court must determine if, absent the "arbitration clause doctrine" excluding the choice of law clause, the clause is part of the contract.

Defendants, either confident in their argument that the arbitration doctrine would exclude the choice of law clause or without a colorable argument for excluding the choice of law clause on any other basis, do not address the question of how the Court should determine the clause's fate without the arbitration clause doctrine. The Plaintiff, however, does address the question, and argues that the choice of law clause, as well as all the other standard terms and conditions, became part of the Bunker Contract by virtue of the conduct of the parties.

To properly assess this argument regarding the conduct of the parties, the Court first steps back to recall the specific circumstances of this case: the Bunker Contract was one which, if the analysis of

its terms were under U.S. law, would be conducted as a "battle of the forms." That is, Kien Hung ordered the bunkers from Trans–Tec (after receiving a quote) and Trans–Tec sent a confirmation of Kien Hung's order to Kien Hung. It was in this confirmation that the "standard terms and conditions" were referenced. It deserves note that this section of the confirmation did not just say that the order was subject to the standard terms and conditions dated January 2000; it also said "pls inform us if you require a copy." The inquiry, order, and confirmation were all exchanged on February 17, 2003, and the bunkering was not scheduled until February 24, 2003 (a week later)—thus, Kien Hung had time to request a copy of the Terms and Conditions.

Plaintiff argues that because Kien Hung did not request a copy of the Terms and Conditions or otherwise object after receiving the confirmation, Trans–Tec could legitimately rely on this inaction as acquiescence to Trans–Tec's terms and conditions. Terms can be incorporated through the conduct of parties, as remarked on by the Malaysian case *Bauer* and English case *British Crane Hire.* Plaintiff primarily relies on *British Crane Hire,* a case in which the defendant rented a crane from the plaintiff. (Anatham Decl. at 106.) After delivery of the crane and the occurrence of the problems with the crane which engendered the lawsuit, defendant received plaintiff's written form of terms and conditions. No prior mention of the terms and conditions had been made. The court found the terms and conditions at issue were implicitly incorporated into the contract between the two parties because testimony showed that plaintiff's terms and conditions were customary in the industry and defendant was operating under an assumption of such parameters of liability and responsibility. (*Id.* at 114.) The facts of *British Crane Hire* are not particularly helpful to Plaintiff's case—indeed, if

the confirmation had come after the provision of the bunkers (and thus at a point when Kien Hung's request for a copy of the terms and conditions would have been futile), it seems unlikely that Plaintiff could prove that choice of U.S. law was generally assumed to be part of a bunker contract. *British Crane Hire* does establish, however, the simple proposition that the conduct of the parties can, in appropriate circumstances, incorporate terms into a contract.

Even acknowledging that Kien Hung was in arrears with Trans–Tec and thus the parties were not on equal bargaining ground, it is fair to take Kien Hung's lack of response to the confirmation as an acquiescence to the full terms and conditions. None of the foreign authorities submitted by the parties have indicated any reason other than the "arbitration clause doctrine" for not incorporating terms into a contract. Because Defendants do not present cases or even arguments to the contrary and because Plaintiff has demonstrated that the conduct of the parties is a relevant inquiry in Malaysian contract law, the Court views the Terms and Conditions as fully incorporated into the Bunker Contract.

C. *Does Malaysian Law Preclude the Possibility of a Maritime Lien That Arises By Contract, Even If That Lien Arises By Application of U.S. Law?*

 Defendants argue that, even if the choice of law clause is incorporated into the Bunker Contract, a maritime lien is not available because Malaysian law does not allow a maritime lien to arise by way of agreement, only by operation of law. Malaysian law does not allow a lien for necessaries and looks to the law of the forum for any grounds for liens for which Malaysian law does not provide:

Any addition to this list of claims attracting maritime liens [which did not include necessaries] must be brought about by the legislature and not the courts and maritime liens created under foreign law would not be recognized unless the underlying claim is one which the *lex fori* also regards as capable of attracting a maritime lien.

(Joseph Oct. 17 Decl. Ex. 39 at 58.) Since the *lex fori* is, in this case, the law of the United States (or of a California District Court sitting in admiralty), Defendants' argument really merges into Defendants' next argument: whether United States maritime law supports a lien under the circumstances of the instant case.

### D. Does U.S. Law Preclude a Maritime Lien Under These Circumstances?

Defendants argue that Unites States law precludes a maritime lien under the circumstances of this case for two reasons: (1) U.S. law does not provide a maritime lien under the FMLA for goods supplied by a foreign plaintiff to a foreign vessel in foreign ports; and (2) Federal contract law would not allow the choice of law clause to stand.

*Whether a Maritime Lien Is Available as a Matter of United States Law.* Defendants argue that a maritime lien is not available to Plaintiff under the facts of this case because the Federal Maritime Liability Act ("FMLA"), 46 U.S.C. § 30101 *et seq.*, does not provide for a maritime lien for necessaries when the supplier of the necessaries is foreign, the Vessel is flagged

under a foreign country, and the necessaries are provided in a foreign port. Here, Plaintiff, the supplier, is a Singapore corporation;[7] the Vessel is flagged as Malaysian; and the bunkers were supplied in Korea. Additionally, the entire contract was negotiated in Asia.

The statute conferring a maritime lien for necessaries does not specify that any of the parties to the lien must be connected to the United States, but statutes are presumed to lack an extraterritorial extension in the absence of explicit language to the contrary. *See F. Hoffmann–La Roche Ltd. v. Empagran S.A.,* 542 U.S. 155, 164, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004) ("This rule of statutory construction cautions courts to assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws."); *EEOC v. Arabian Am. Oil Co.* ("*Aramco*"), 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) ("It is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.' ... We assume that Congress legislates against the backdrop of the presumption against extraterritoriality." (internal citations omitted)). The statute states: "[A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner—(1) has a maritime lien on the vessel; (2) may bring a civil action in rem to enforce the lien; and (3) is not required to allege or prove in the action

---

**7.** In the original filings on choice of law, Trans–Tec contended that it should be treated as a United States corporation since it is ultimately owned by World Fuel Services ("WFS"), a Miami-based company. Trans–Tec, however, identified itself in its Complaint as "a division of a corporation organized and existing by virtue of and under the laws of Singapore ...." (Complaint ¶ 4.) This is a

binding judicial admission. *Am. Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 226 (9th Cir. 1988) ("Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them."). In this round of briefing, Trans–Tec does not argue that it should be considered a U.S. company and Trans–Tec has not amended its pleadings.

that credit was given to the vessel." 46 U.S.C. § 31342(a). No evidence has been presented to rebut the presumption that U.S. laws are not intended to apply extraterritorially. Maritime law is an especially sensitive area of extraterritorial application of laws. As then-Judge Kennedy remarked in a Ninth Circuit maritime case, a myopic choice of law approach in maritime cases, looking only to the place of supply (rather than at other contacts as well),

would run counter to an important principle, which is the desirability, even the necessity, of accommodating the legitimate interests of separate sovereignties in vindicating their own legal policies. This principle is of special import in admiralty, where international relations are delicate.

*Gulf Trading & Transportation Co. v. M/V Tento,* 694 F.2d 1191, 1194 (9th Cir.1982).

In accord with this presumption against the extraterritorial application of U.S. law, numerous authorities have deemed the FMLA not to extend to transactions in which all the players and points of contact are foreign. The Eleventh Circuit has concluded that the FMLA "does not provide for a maritime lien for goods and services supplied by a foreign plaintiff to foreign flag vessels in foreign ports." *Trinidad Foundry and Fabricating, Ltd. v. M/V K.A.S. Camilla,* 966 F.2d 613, 617 (11th Cir.1992). *Trinidad Foundry*'s facts are different than the facts in this case, but not in a material way—while in *Trinidad Foundry* the parties had chosen English law to govern disputes and English law does not allow for a maritime lien, the court's declaration regarding FMLA coverage was a *separate* basis for not recognizing a maritime lien, totally unrelated to the other basis for denying a maritime lien (that English law, the law chosen by the parties, did not recognize a maritime lien). Leading treatises on maritime law concur in the Eleventh Circuit's analysis. For example, *Benedict On Admiralty* states that "[i]t should be noted that there is no maritime lien under the Maritime Lien Act, 46 U.S.C. § 31342, for a foreign supplier of goods and services to a foreign flag vessel in a foreign port." 2 *Benedict on Admiralty* § 38, at 3–35 (7th ed. revised 1997); *see also* 1 Admiralty & Mar. Law § 9–8 (4th ed.) (Thomas J. Schoenbaum ed.) ("In cases where services or supplies are rendered by foreign companies in foreign ports, the [FMLA] is generally inapplicable. The purpose of the FMLA is to protect American, not foreign, suppliers."). The *Trinidad Foundry* court cited two cases in support of its interpretation of the FMLA, *Tramp Oil and Marine, Ltd. v. M/V Mermaid I,* 805 F.2d 42 (1st Cir.1986), and *Swedish Telecom Radio v. M/V Discovery I,* 712 F.Supp. 1542 (S.D.Fla.1989). In *Tramp Oil,* the First Circuit stated that "[t]he primary concern of the Federal Maritime Lien Act is the protection of American suppliers of goods and services." 805 F.2d at 46. The First Circuit punctuated its refusal to extend a maritime lien on the *Tramp Oil* facts [8] by commenting that "[t]he maritime lien is a special privilege, 'operating to the prejudice of general creditors and purchasers without notice,' and its open-ended extension could radically change the presuppositions of maritime commerce." *Id.* (internal citations omitted). The *Trinidad Foundry* court presumably relied on the First Circuit's finding that the FMLA was designed to protect American suppliers

---

**8.** The *Tramp Oil* facts were different than those in the case at hand. In *Tramp Oil,* a fuel broker (as opposed to fuel supplier) was attempting to put a lien on a ship because the broker had not been paid. The vessel, however, had already paid the provider of the bunkers. The bunkers were provided in a Georgia port. *Tramp Oil and Marine, Ltd. v. M/V Mermaid I,* 805 F.2d 42 (1st Cir.1986).

and that the maritime lien is a powerful remedy, not one to be applied lightly, and thus concluded that the FMLA was not designed to cover factual scenarios so divorced from the United States' territory. The *Swedish Telecom* court relied on *Tramp Oil*'s statement regarding the purpose of the FMLA and also commented that the result did not "disserve[ ] the international system" given that most other countries' laws would not support a maritime lien under these circumstances (provision of necessaries). 712 F.Supp. at 1545–46.

█ None of the cases cited by Plaintiff debunk Defendants' argument that the FMLA is not properly applied to a foreign vessel and supplier where the provisions were made in a foreign port. *Liverpool and London Steamship Protection and Indemnity Association Limited v. Queen of Leman MV*, 296 F.3d 350 (5th Cir. 2002), only dealt with whether United States or English law should apply, given the contract language. The court specifically limited its findings to the choice of law determination, which had been certified for interlocutory appeal. *Id.* at 355 n. 5. Thus, the *Liverpool* court did not address the availability of a lien under United States law (in fact, the court wrote, "we therefore concluded that in this case the P & I rules call for the application of United States substantive law *to determine the existence of maritime liens.*" *Id.* at 355 (emphasis added).)

*Gulf Trading & Transportation Co. v. Vessel Hoegh Shield*, 658 F.2d 363 (5th Cir.1981), involved the provision of bunkers within the United States' jurisdiction by an American corporation—obviously materially different facts than those in the instant case. Additionally, the *Gulf Trad-*

*ing* court pointed out that the congressional intent behind the FMLA was "that an American supplier of goods, services or necessaries to a foreign vessel obtains a maritime lien in the vessel when the good or services are supplied or performed in the United States," *id.* at 367, a conclusion which buttresses rather than debunks Defendants' arguments.[9]

In *Conti–Lines, S.A. v. M/V Baroness V*, 1992 AMC 681, 1991 WL 340173 (Mid.Dist. Fla.1991), a magistrate judge rejected the conclusion in *Swedish Telecom* that a non-U.S. citizen could not assert a maritime lien under the FMLA. *Id.* at 683, 1991 WL 340173. In *Conti–Lines*, the repairs had been performed in New Orleans, *id.* at 682, 1991 WL 340173, so the transaction was connected with the United States. Most importantly, though, *Conti–Lines* was decided *before* the Eleventh Circuit decided *Trinidad Foundry*.

█ No evidence has been presented to rebut the presumption against a congressional intent for a Unites States law to apply extraterritorially. *See Empagran,* 542 U.S. at 164, 124 S.Ct. 2359; *Aramco,* 499 U.S. at 248, 111 S.Ct. 1227. Particularly in the maritime context, where players from so many countries are involved—and even more particularly in the maritime lien context, where few (if any) countries allow a maritime lien for necessaries—it makes sense that the United States have some interest in the transaction before the maritime lien remedy can be properly asserted. The Eleventh Circuit persuasively reads the FMLA as not providing a maritime lien in the circumstances of this case and, in the absence of any persuasive reasoning or case citations by the Plaintiff, the Court finds that a maritime lien is not

---

9. The *Gulf Trading* court discussed 46 U.S.C. § 971 rather than 46 U.S.C. § 31342; however, the latter statute is an amendment of the former and was not meant to change the substantive meaning of the former statute. 2 *Benedict on Admiralty* § 35, at 3–18 (7th ed. revised 1997).

available to Plaintiff as a matter of United States law.[10]

*Federal Contract Law.* Because the Court has found that United States law does not support a maritime lien under the facts of this case, it is unnecessary for this Court to undertake an analysis of whether federal contract law would support the imposition of the choice of law clause and the attendant maritime lien.

### E. The "Standard Terms and Conditions" Sheet

Defendants argue that (1) Plaintiff has not submitted uncontroverted evidence that the Terms and Conditions supplied to the Court, in a document entitled "The Trans–Tec Services Group of Companies General Terms and Conditions" which contains the choice of law clause on which this round of briefing is based, are *Plaintiff's* Terms and Conditions; and (2) Plaintiff has not submitted uncontroverted evidence that Kien Hung was ever supplied the Terms and Conditions referenced by the Bunker Confirmation. The Court is unconvinced by Defendants' attempt to raise factual disputes. Because United States law does not support a maritime lien under the facts of this case, however, it is unnecessary for the Court to detail Defendants' arguments and the Court's skepticism.

## IV. CONCLUSION

The Court finds that Malaysian law governs the analysis of whether the choice of law clause is part of the Bunker Contract and that under Malaysian law the choice of law clause is part of the Bunker Contract. However, the Court also finds that United States law, the chosen law, does not support a maritime lien for necessaries under the facts of this case. Accordingly, the

Court GRANTS summary judgment for Defendants.

IT IS SO ORDERED.

---

**10.** The Bunker Contract specifically mentioned that a maritime lien was included in its choice of United States law; however, this is irrelevant because maritime liens may not arise by contract, but only by operation of law. *See Rainbow Line, Inc. v. M/V Tequila,* 480 F.2d 1024, 1026 (2d Cir.1973).